IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

STARK MASTER FUND LTD. AND
STARK GLOBAL OPPORTUNITIES
MASTER FUND LTD.

Case No. _____

Plaintiffs,

v.

CREDIT SUISSE SECURITIES (USA) LLC,
DEUTSCHE BANK SECURITIES (USA), INC.,
APOLLO GLOBAL MANAGEMENT LLC, AND
APOLLO MANAGEMENT HOLDINGS, L.P.,

Defendants.

---

## COMPLAINT

---

Plaintiffs Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. file this Complaint against Defendants Deutsche Bank Securities USA, Inc., Credit Suisse Securities (USA) LLC, Apollo Global Management LLC and Apollo Management Holdings, L.P. and allege as follows:

### Nature of the Action

1.      This is a suit to recover for losses and, given the egregious conduct alleged, substantial exemplary damages resulting from defendants' material misrepresentations relating to the failed acquisition of a global chemical company, Huntsman Corporation, by Momentive Specialty Chemicals Inc., f/k/a Hexion Specialty Chemicals, Inc. ("Hexion"). Apollo, as indirect owner of Hexion, sought to acquire Huntsman and entered into a bidding contest with Basell Holdings, a Netherlands-based chemical company. Credit Suisse and Deutsche Bank (the "Banks") were to be the financiers of Apollo's bid. Together,

Apollo/Hexion and the Banks eventually outbid Basell when they committed to a $28 per share "fully financed" deal. Based in large part on the Banks' "rock solid" Commitment Letter promising full financing without any syndication out, Huntsman agreed to terminate its merger agreement with Basell and enter into a merger agreement with Hexion.

2.      In the Commitment Letter and elsewhere, the Banks intentionally misrepresented that Apollo's acquisition of Huntsman was "fully financed," which, along with other misrepresentations contained in the Commitment Letter, induced plaintiffs to purchase Huntsman stock. What plaintiffs did not know and what the Banks misrepresented was the fact that the Banks had entered into various secret side agreements with Apollo that substantially varied the terms of the Commitment Letter. As detailed below, these various secret agreements prove that the Banks' financing of the Hexion - Huntsman merger was anything but "rock solid" and would likely evaporate at the first sign of trouble in the credit markets or if Apollo failed to honor any of these secret side agreements.

3.      These undisclosed agreements included:

a.      The Banks and Apollo secretly agreed that the proceeds of nearly $1 billion of Huntsman's asset sales and divestitures would be "credited" against the committed financing in the form of a reduction in the amount that could be drawn on the financing.

b.      The Banks and Apollo secretly agreed to adjust the interest rate caps established in the Commitment Letter.

c.      The Banks and Apollo secretly agreed to add a debt leverage ratio covenant.

d.      The Banks and Apollo secretly agreed that Apollo, as the Banks' "partner," would insulate the Banks from syndication risk and losses. To the contrary, the Commitment Letter made clear that "the completion of such syndications is **not** a condition to the commitments hereunder." (Emphasis added).

e.  The Banks and Apollo secretly agreed that Apollo would not waive its material adverse change ("MAC") clause in the merger agreement without the Banks' consent.

f.  The Banks and Apollo secretly agreed that the Banks would finance $100 million of Hexion's Basell break-up fee, which reduced the Banks' "rock solid" funding by $100 million.

g.  The Banks and Apollo secretly agreed to a $308 million implied equity commitment by Apollo to cover the anticipated shortfall of funding created by Apollo raising its bid to $28 per share and adding an 8% ticking fee which reduced the Banks' funding by still another $308 million.

h.  Apollo and the Banks secretly agreed to convert a small portion of the term loan and revolver debt into an asset backed loan.

4.  None of these secret side agreements were disclosed to plaintiffs at the time of the merger negotiations or purchase of the stock. The secret side deal on the asset backed loan was in the form of a "verbal commitment to Apollo" documented by Deutsche Bank prior to signing of the merger agreement. It was later disclosed by Hexion at the request of the Banks in November 2007 and was then specifically reviewed and approved by Huntsman. This was the only side agreement ever disclosed to Huntsman, and it is evidence that the Banks fully intended to enforce all of the undisclosed agreements with Apollo and Hexion.

5.  The undisclosed agreements were so important to the Banks that they were agreed to and acknowledged at the highest levels of Apollo and the Banks (by Brady Dugan, CEO of Credit Suisse, and Tommy Gahan, the Head of the Americas, of Deutsche Bank). In an internal memorandum from a senior Credit Suisse banker, CEO Brady Dugan was specifically prepared for his high level meeting with Apollo founding partner, Leon Black: "Credit Suisse is trusting Apollo to deliver on its commitment to Credit Suisse. Credit Suisse underwrote $7 billion dollars of the deal based on a explicit handshake that Apollo would get Credit Suisse down to $3 and a half billion within days and Apollo made a commitment to look after Credit

Suisse on the bank deal pricing." "We had an explicit handshake that you will get us down and you haven't. You have promised to look after us on pricing, and you haven't, and we want you to do something about it."

6.     Similarly, Gahan of Deutsche Bank was briefed on the undisclosed agreements with Apollo in internal documents: "Wanted to reiterate our position on Apollo/Huntsman. This was a difficult transaction given the size of our commitment (EUR 4.1 billion) and the declining state of the market. Nevertheless, we agreed to move forward largely on the commitment you received from Josh Harris, a founding member of Apollo, to do the following (i) work with us on the covenant issue, and (ii) to use their relationships to sell us down to 15% (EUR 1.24 billion)." In Gahan's preparation briefing for his important telephone communication with Josh Harris, he was told "This is an opportunity for Josh to tell Tommy, you can trust us," and "I have let Josh know this is critical for us to move forward." Following the Gahan/Harris call, an internal bank document revealed: "And we are there on Josh's assurances to Tommy rather than the final structure alone."

7.     When Apollo refused to honor the undisclosed agreements and the Banks balked at funding, the merger completely collapsed. When the dust settled from the merger rubble, the Commitment Letter and merger funding were clearly revealed as a complete fraud and sham orchestrated by Apollo and the Banks.

8.     The damage to all of the Huntsman shareholders caused by Apollo and the Banks was nearly $7 billion. Today, the damages to unaffiliated and non-compensated Huntsman investors, such as plaintiffs, are in the billions of dollars.

**Parties**

9.      Plaintiffs Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. ("Stark") are British Virgin Islands corporations and are managed by Stark & Roth, LLC located at 3600 South Lake Drive, St. Francis, Wisconsin. Both Funds are comprised of investments from various individual and institutional investors including, without limitation, pension funds, foundations, and university endowments.

10.     Defendant Deutsche Bank Securities (USA), Inc. is a Delaware corporation with its principal place of business in New York, New York.  Deutsche Bank Securities, USA, is licensed in Wisconsin as a broker-dealer and is doing business in Wisconsin as such.  Its registered agent for service of process is CT Corporation System.

11.     Defendant Credit Suisse Securities (USA) LLC is a Delaware corporation with its principal place of business in New York, New York.  Credit Suisse Securities (USA) is licensed in Wisconsin as a broker-dealer and is doing business in Wisconsin as such.   Its registered agent for service of process is Corporation Service Company d/b/a CSC -- Lawyers Incorporating Service Company.

12.     Defendant Apollo Global Management LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.  Its registered agent for service of process is Corporation Service Company.  Apollo Global Management invests in Wisconsin companies as part of its portfolio of companies that it actively manages and controls.

13.     Defendant Apollo Management Holdings, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.  Its registered agent for service of process is Corporation Service Company.

## Jurisdiction and Venue

14.     The Court has jurisdiction over defendants because each of them have either (a) had continuous and systematic contacts with the State of Wisconsin through business and transactions in Wisconsin, or (b) sufficient minimum contacts with the State of Wisconsin to give rise to jurisdiction for purposes of this lawsuit.

15.     Each of the defendant Banks is subject to personal jurisdiction in Wisconsin.  They continuously and systematically do substantial business with citizens and companies in Wisconsin.  Defendants' contacts include conducting numerous transactions in Wisconsin, through which they have provided financing or other advice and resources.   The officers, agents, and employees of the defendant Banks frequently come to Wisconsin and negotiate transactions in Wisconsin.   Defendants have, therefore, purposefully availed themselves of the benefits of the State of Wisconsin and are subject to general, personal jurisdiction here.  The assertion of such jurisdiction by the courts is reasonable.

16.     Each of the Apollo defendants is subject to personal jurisdiction in Wisconsin.  They continuously and systematically do business within the state and they do substantial business with citizens and companies in Wisconsin.  Defendants' contacts include conducting numerous transactions in Wisconsin, including investing in and managing companies located in this state.  The Apollo defendants have, therefore, purposefully availed themselves of the benefits of the state of Wisconsin and are subject to general, personal jurisdiction here.  The assertion of such jurisdiction by the courts is reasonable.

17.     Venue is proper in the Eastern District of Wisconsin, because a substantial part of the misrepresentations or omissions giving rise to plaintiffs' claims occurred here.

# Factual Background

## A.  Apollo Tries and Fails to Acquire Huntsman in 2005.

18.  Huntsman is among the world's largest global manufacturer and marketer of differentiated chemical products and inorganic chemical products. Hexion is a manufacturer of specialty chemicals and materials, some of which are similar to those made by Huntsman.

19.  Apollo is a collection of asset managers and investment funds with more than $60 billion of assets under management specializing in the management of leveraged buy-outs utilizing large quantities of junk bonds and other forms of debt. Apollo controlled Hexion by its board membership composition. In fact, there were no truly "independent" members of the Hexion board. In addition to serving as a traditional board for Hexion, Apollo representatives also served in a business development capacity for Hexion, as Hexion CEO Craig Morrison testified in the Delaware Chancery Court in a related proceeding in September of 2008: "Apollo serves in a board capacity, in the sense as a traditional board would, as well as in a business development role. They have a lot of expertise in deal making and a lot of contacts on Wall Street, so they also serve a business development role for us."

20.  Apollo, on behalf of Hexion, first tried to acquire control of Huntsman in 2005. Given the overlap of some key product lines and the large potential synergies, there was considered to be substantial "industrial logic" to the combination of Hexion and Huntsman. In November 2005, Apollo approached Huntsman with a preliminary proposal for the acquisition of Huntsman by Hexion.

21.  After receiving Apollo's preliminary proposal in November 2005, Huntsman put in place a process to identify and obtain bids from other potential acquirers in addition to Apollo.

22.     By representing that it was prepared to pay a price of $25 per share, Apollo persuaded Huntsman to end discussions with other bidders and to negotiate exclusively with Apollo.  At the eleventh hour of the negotiations, Apollo informed Huntsman that its $25 per share offer would need to be reduced, purportedly in light of recent developments in Huntsman's financial performance.  Apollo also refused to accept certain critical terms of the proposed merger agreement required by Huntsman.  Unwilling to accept a lower price and Apollo's unacceptable merger terms, Huntsman terminated negotiations with Apollo.

**B.     Apollo Again Seeks to Acquire Huntsman in 2006.**

23.     Following the termination of the sale discussions with Apollo in February 2006, Huntsman pursued its previously announced strategy of divesting its base commodity chemicals and polymers businesses.  During this period, Apollo again suggested it would be willing to pay $25 per share to acquire Huntsman.  But, after engaging Huntsman's interest, Apollo recanted and said that it would offer only between $20 to $21 per share, a lowball offer price in which Huntsman was not interested.

**C.     Apollo Again Seeks to Acquire Huntsman in 2007 but Loses to Basell.**

24.     In May 2007, Huntsman received an unsolicited letter from a third party proposing to acquire Huntsman at a price of $24 per share, subject to due diligence and obtaining committed financing.  Huntsman contacted several other parties, including Apollo, to determine whether anyone else would be willing to offer a higher price.  In response to these inquiries, on May 18, 2007, Huntsman received a preliminary written offer from Apollo, on behalf of Hexion, offering to pay $25 per share to acquire Huntsman.

25.     Apollo remained eager to acquire Huntsman.  Apollo's portfolio company, Hexion, described itself as the global leader in thermo set resins.  Apollo believed Huntsman, in

combination with Hexion, would create a "bellwether" specialty chemical company that would be a "must own" in the publicly traded specialty chemical space.

26.     As a result of the competing bids, Huntsman created a Transaction Committee to oversee the evaluation process related to the acquisition proposals. Huntsman and the Transaction Committee retained legal and financial advisors to assist in the process. Apollo actively participated in that process, including Josh Harris personally leading the negotiations for Apollo.

27.     On June 12, 2007, Apollo submitted a formal written offer for Hexion to purchase Huntsman in a cash merger at a price of $25 per share. At that time, Apollo represented to Huntsman that they were strongly committed to the transaction, and tried to dissuade Huntsman from dealing with other remaining bidders.

28.     On June 16, 2007, Apollo submitted its initial financing commitments to Huntsman, representing that the Banks would fully finance the offer. The ability to fully finance the deal was very important for Huntsman, its Board of Directors, and its shareholders. Indeed, Peter Huntsman later testified about the importance of a fully financed commitment letter by the Banks, especially when doing a deal with Apollo: "Well, it goes back to the distrust that the board had with Apollo . . . the risk of this transaction is the funding and that's where the vast majority of the risk is. If it's in the funding and you have tight commitment letters and you have the banks, they're fully committed and they're standing behind a deal that is 100 percent financed by the banks that is rock solid, that should give the board some comfort. It certainly lessens our reliability on Apollo, who we did not trust."

29.     Thereafter, Huntsman representatives informed Apollo that the Transaction Committee would meet on June 25, 2007, to evaluate further the offer from Apollo

and the June 22, 2007 initial offer from Basell, that Apollo's current offer of $25 per share was unlikely to result in Huntsman's Transaction Committee recommending that the company accept Apollo's proposal, and that Apollo should submit its best and final offer.

30.     On the afternoon of June 25, 2007, Apollo submitted a revised offer on behalf of Hexion to purchase Huntsman at $26 per share. On the same afternoon, Basell submitted a final proposed merger agreement and committed financing by its bank to purchase Huntsman, in cash, at a price of $25.25 per share.

31.     Later on June 25, Huntsman's Board of Directors met to consider the terms, conditions, and risks associated with the merger proposals of Basell and Apollo. Both management and the principal shareholders expressed the view that the Basell transaction, although nominally at a lower price, represented the better alternative of the two proposals because the Basell proposal had lower financing and regulatory risks and could be consummated more quickly.

32.     After considering the proposed terms of the competing proposals, the Transaction Committee unanimously resolved to recommend that the Huntsman Board of Directors approve the Basell proposal. Thereafter, the full Huntsman Board approved the Basell merger agreement and recommended that Huntsman's shareholders adopt the agreement. That evening, Huntsman and Basell entered into a definitive merger agreement. The deal was announced to the public the next morning, on June 26, 2007. Under the terms of the deal, Huntsman shareholders would receive $25.25 per share of Huntsman stock.

**D.      Apollo and the Banks Persuade Huntsman to Terminate the Basell Merger and Enter into a Merger Agreement with Hexion.**

33.     The Banks, having longstanding business relationships with Apollo, considered themselves to be Apollo's partners and consistently agreed to act in concert with

Apollo to achieve its goal of acquiring Huntsman at the price Apollo wanted to pay. If Apollo succeeded in acquiring Huntsman, the Banks stood to make hundreds of millions of dollars of financing fees, so they had substantial and shared financial interest with Apollo in its effort to acquire Huntsman. The Banks also understood that they had no relationship with Basell for purposes of the deal, and would be excluded from enormous financing fees if Basell, rather than Apollo, won the right to acquire Huntsman.

34. When Apollo learned that Huntsman had entered into a merger agreement with Basell, its representatives were furious. In an email Josh Harris, a senior partner at Apollo, stated: "What a disaster. Still trying to figure out what happened? I will make those guys pay." Harris was determined to derail Huntsman's announced merger agreement with Basell. Apollo immediately developed a strategy to interfere with Huntsman's agreement with Basell, in order to induce Huntsman and its shareholders to forego it in favor of an agreement with Apollo's portfolio company, Hexion.

35. Apollo told Huntsman that if Huntsman would terminate its merger agreement with Basell, Apollo was prepared to increase its proposal to a price of $27 per share. Harris told Huntsman's chairman that Apollo would do anything it had to do to beat Basell. On June 29, 2007, Apollo delivered a letter to Huntsman outlining a revised proposal for Hexion to acquire Huntsman at a price of $27.25 per share. Included in this letter was a Commitment Letter from the Banks, dated June 28, 2007, that represented that the Banks had committed to provide 100% funding. Indeed, Credit Suisse and Deutsche Bank each committed to provide "50% of the principal amount" necessary to fund the deal.

36. Apollo knew that Huntsman's board had a fiduciary duty to consider any bid likely to result in a superior value to its shareholders. Of course, the revised Apollo offer

would benefit Huntsman's shareholders only if it were consummated. What led Huntsman to accept Basell's proposal in the first instance was the greater certainty that it could be closed in a shorter timeframe and the rock-solid financing for the deal. Therefore, in subsequent negotiations with Apollo, a critical issue was the commitment of Apollo to close the merger with Hexion at the higher price, and the purportedly firm commitment of the Banks to fund it on the terms presented to Huntsman. Apollo agreed that there was no financing "out" in the Merger Agreement. The Banks also agreed in the Commitment Letter that there would be no syndication "out"—meaning that although they had the right to try to syndicate (*i.e.*, sell) the merger debt to other financial institutions or investors, a successful syndication of the merger debt was not a condition to the Banks' obligation to fund the full committed amount at closing. If the Banks could not syndicate the debt, or could sell it only at a loss to themselves, they and they alone bore the risk of that loss. Apollo and the Banks intended for and knew that institutional shareholders such as plaintiffs would rely on the Commitment Letter in deciding whether to purchase shares of Huntsman stock.

37. On July 4, 2007, Apollo, through Hexion, issued a press release announcing "Hexion Specialty Chemicals Confirms Proposal to Acquire Huntsman Corporation for $27.25 Per Share in Cash," representing that "[t]he proposal is fully financed pursuant to commitments from Credit Suisse and Deutsche Bank." Apollo, through Hexion, intended for and knew that plaintiffs would review and rely on this press release in deciding whether to purchase shares of Huntsman.

**E. The False Representations of Committed Funding and the Financing Deficit Created by Apollo's Increased Bid**

38. After Apollo's bid increased to $27.25, Huntsman notified Basell that it had received a revised proposal from Apollo. On July 5, 2007, Basell delivered a letter to

Huntsman arguing that the Basell merger agreement was superior to the Apollo offer because, in part, it had less completion risk.

39.     On July 6, 2007, Hexion issued a press release announcing that the Transaction Committee and the Huntsman board had determined that Hexion's bid of $27.25 per share was a superior proposal to the Basell merger agreement, and reiterated that "Hexion's proposal is fully financed pursuant to commitments from Credit Suisse and Deutsche Bank."

40.     Fearful that it would not succeed in derailing the Basell merger, Apollo made additional misrepresentations.  First, Apollo represented to Huntsman through oral and written correspondence that Apollo was fully committed to close the transaction on the terms set forth in their revised proposal—knowing that the proposed terms were not the real terms on which financing was to be provided by the Banks.

41.     In order to further persuade Huntsman to terminate the Basell merger, on July 8, 2007, Apollo increased its proposal to a price of $28 per share, plus a "ticking fee" payable if the merger did not close by April 5, 2008.  Apollo also agreed to cause Hexion to fund $100 million of the $200 million breakup fee that would be due Basell if Huntsman relinquished its contract with Basell.

42.     On July 9, 2007, Hexion issued a press release announcing the increased bid, again representing that its proposal "is fully financed pursuant to commitments from affiliates of Credit Suisse and Deutsche Bank."

43.     Because the Banks intended to syndicate the merger debt, applicable accounting and bank capitalization rules required them to record on a current basis, in their financial records, a "mark-to-market" value of the likely price at which they would be able to sell the merger debt at closing.  The Banks were aware that the credit markets could tighten, in which

case investors would demand a higher return on their debt investments. The interest rates in the Commitment Letter, however, were capped at specified maximum rates. The only way to create higher return that would sell in the market, therefore, would be to reduce the price at which the debt is sold. The fact that this reduction would be necessary at closing would require the Banks to record current, mark-to-market losses in their financials on a regular basis even though the merger was not scheduled to close for many months. Sometimes called "syndication losses," these mark-to-market losses were a reflection of the present value of the future loss the Banks expected to sustain if they were required to honor their commitment and fund the merger at closing. The Commitment Letter expressly provided that the Banks alone would assume the risk of all such syndication losses.

44.     Under the guise of rock-solid financing commitments, the Banks lured an unsuspecting Huntsman to consent to sell the company to Apollo, and plaintiffs to purchase shares of Huntsman, premised upon financing that was represented to be air tight, with no material adverse event "outs," minimal financial covenants, and an express assumption by the Banks of syndication risk. In a July 8, 2007 letter to Huntsman, Apollo states: "As your financial advisors have agreed with us, our financing commitments are of the highest quality and strength available in U.S. markets. Credit Suisse is the leading lender in this industry and to private equity sponsors generally. They have to all of their knowledge, never failed to fund a commitment when required to do so. . . . To quote one of your advisors, these papers are, quote, rock solid. Our proposal is firm and fully financed." The Banks knew about this representation to Huntsman.

**F.     Huntsman Relinquishes Its Contract with Basell.**

45.     As a result of the false representations made by Apollo and the Banks, the Transaction Committee concluded that the revised Apollo offer was superior to the Basell

transaction. Accordingly, on July 12, 2007, Huntsman terminated the Basell merger agreement and paid the $200 million termination fee to Basell, of which Apollo, through Hexion and secretly supported by the Banks, funded $100 million. On the same day, Huntsman and Hexion entered into their definitive Merger Agreement. Apollo and the Banks knew and intended that plaintiffs would rely on the Merger Agreement—and the representations made therein—in plaintiffs' decision to purchase Huntsman stock.

46. Huntsman also issued a press release announcing the signing of the merger agreement with Hexion. The press release states: "The transaction is not subject to a financing condition and commitments have been obtained by Hexion for all necessary debt financing from affiliates of Credit Suisse and Deutsche Bank AG." Despite having actual knowledge that Huntsman had just unwittingly made a material misrepresentation, Apollo and the Banks did not correct this misstatement. Instead, they supported the misrepresentation and Hexion issued a Form 8-K and press release announcing that the transaction was "fully financed pursuant to commitments from affiliates of Credit Suisse and Deutsche Bank."

47. Despite these misrepresentations, in August Credit Suisse successfully solicited plaintiffs to buy Huntsman stock owned by Credit Suisse.

G.     **The Banks' Representations that the Deal Was "Fully Financed" Were Especially Likely to Induce Plaintiffs' Reliance.**

48. The existence of a firm, rock solid commitment letter was highly material to Huntsman's decision about which bid to accept and plaintiffs' decision about whether to purchase stock. Apollo and the Banks represented to Huntsman that theirs was a solid commitment letter, with no undisclosed conditions. The Banks' Commitment Letter contained detailed provisions purporting to describe the terms of the committed financing. These ostensibly firm terms included descriptions of tranches of debt, interest rate caps (which

specified the maximum interest rate that could be charged), and the absence of any debt coverage covenants.

49. The existence of these definitive terms—and the lack of any covenants imposing other limitations on the use of funds—were highly material to plaintiffs in their decision to purchase shares of Huntsman's stock. At the time of the merger negotiations, Apollo/Hexion and the Banks agreed with a large shareholder and member of the Huntsman Board, MatlinPatterson, to sell 56 million shares of Huntsman stock prior to the culmination of the merger. If the Banks could not sell those shares, they would have retained ownership—in effect increasing their overall financing load beyond what was already tenable. Thus, persuading plaintiffs to purchase these shares was crucial to Apollo's and the Banks' success in completing the merger. This was achieved through the Banks representations in the Commitment Letter and other documents to "fully finance" the transaction, intentionally inducing plaintiffs to believe in the quality of the committed financing, and thus the high likelihood that the deal would close and thereby making these shares a reasonable investment for plaintiffs. In the end, the Banks' purported commitment succeeded in inducing plaintiffs to purchase Huntsman shares in expectation of the consummation of the Huntsman/Hexion merger.

50. Additionally, in its August 10, 2007 preliminary proxy and September 12, 2007 definitive proxy statement, Huntsman explained that one of the primary reasons the Transaction Committee supported the Apollo transaction was "the nature of Hexion's financing commitments received with respect to the merger, including the identity of the institutions providing such commitments, the limited conditions to the obligations of such institutions to fund such commitments, including the absence of a material adverse effect provision and the duration of such commitments." Under the terms of the merger agreement, Hexion (*i.e.* Apollo)

had the right to review the proxy statement issued by Huntsman for a vote of its shareholders on the transaction, and Hexion's lawyers in fact did so. As Hexion's own attorney testified, there were provisions of the proxy statement that Hexion would have superior knowledge on, and therefore to ensure accuracy, and to avoid potential future liability, Hexion exercised its right to review and approve the proxy statement issued by Huntsman.

51.     Plaintiffs were especially likely to rely on the statements regarding the financing commitments of the Banks, and the Banks, together with Apollo, intended that they do so.

### H.     The Secret "Business Understanding" About the Financing

52.     Despite the many assurances, the reality was that the Commitment Letter was not viewed by Apollo or the Banks as the "real" deal. Rather, they had agreed, and intended to act upon, an entirely different business understanding that rendered illusory the representations that adequate funding existed to close the transaction and operate the combined entities, and that the Banks alone bore the risk of syndication losses. For example, internal Credit Suisse documents indicate that it agreed to the Commitment Letter "based on an explicit handshake that Apollo would get Credit Suisse down from $7 billion to $3 and a half billion within days and Apollo made a commitment to look after Credit Suisse on the bank deal pricing." And Deutsche Bank's internal documents reflect that it "agreed to move forward largely on the commitment . . . received from Josh Harris, a founding member of Apollo, to . . . work with us on the covenant issue, and . . . to use their relationships to sell us down to 15%." Additionally, Deutsche Bank orchestrated an important telephone call between senior banking official, Tommy Gahan, Head of the Americas, and Josh Harris, founding partner of Apollo, and Gahan reported the conversation to his deal colleagues: "I spoke to him tonight and he said all of the right things. Trust us. We won't leave you hung. We've priced the deal through the caps in

the past. We gave Credit Suisse the same assurances. And they are fine." Numerous similar email communications between Apollo and the Banks reveal the undisclosed side agreements in detail. Such documents are consistent with a court of appeals' conclusion in a prior proceeding that there was evidence that "the Banks and Apollo had an undisclosed agreement from the outset to vary from the terms of the commitment letter."

53. The Banks also received assurances from Apollo that they would sustain no loss on the financing commitment, regardless of the terms of the Commitment Letter. The sole purpose of these assurances was to eliminate the syndication losses the Banks stood to sustain if they were actually required to provide financing on the terms on which they had agreed. When asked whether it was acceptable for Apollo, through Hexion, to assume this syndication risk, Peter Huntsman testified: "That was not acceptable at all, that is particularly if the obligation is going to Hexion. They certainly don't have a financial wherewithal to be able to back these sort of commitments." As such, it was clear that it was not really Hexion, but its puppet master, Apollo, that was orchestrating the deal activity on the buyer's side.

**I.** **Apollo and the Banks Know the Merger Was Not "Fully Funded."**

54. Huntsman and plaintiffs were unaware of the scheme by Apollo and the Banks to manipulate financing terms, and equally unaware of the Banks intention not to perform under the terms of the Commitment Letter as disclosed and promised.

55. Apollo, through Hexion, made an express representation in the Merger Agreement that there were no conditions to the performance of the Commitment Letter that were not reflected in its text. Apollo knew this representation was categorically untrue and misleading, because it knew Apollo had entered into a series of secret agreements with the Banks, not reflected in the Commitment Letter, that fundamentally changed the terms of the Letter and rendered it wholly illusory. Apollo and the Banks also knew that institutional

investors, such as plaintiffs, would rely on these representations in determining whether to purchase Huntsman stock.

56.     Before the Commitment Letter was signed, Apollo made assurances to the Banks that they would be protected against losses on the financing, and additional assurances that they would not be expected to fund the financing on the terms stated in the Commitment Letter.  Apollo readily provided those assurances, as noted in an email from Josh Harris to Credit Suisse: "Got it.  We always take care of you."

57.     The first secret assurance Apollo provided to the Banks concerned the use of proceeds of anticipated sale assets.  Apollo and the Banks knew that Huntsman was in the process of divesting its base chemicals and polymers business, and that the sale of those assets was expected to generate nearly a billion dollars in proceeds.  In addition to the proceeds from the sale of those businesses, Apollo and the Banks knew that any merger with Hexion would require the divestiture of additional assets, and would therefore generate even more cash proceeds.  The signed Commitment Letter did not state that the proceeds of any of those asset sales would reduce the funding available under the Commitment Letter; to the contrary, the letter stated that the full amount of the committed funding would be available to be drawn at closing.

58.     Apollo and the Banks, however, secretly had agreed that the proceeds of the nearly $1 billion of asset sales and divestitures would be "credited" against the committed financing in the form of a reduction in the amount that could be drawn on the financing.  In other words, if divestitures occurred, the Banks expected to have the benefit of those proceeds and reduce the funding available under the Commitment Letter.  This secret business understanding ensured that the committed financing was actually worth nearly $1 billion less than Apollo and the Banks had represented to Huntsman and plaintiffs.  It also ratcheted up the risk of shortfall in

the amount required to close the transaction. Apollo and the Banks did not disclose to Huntsman or plaintiffs their secret agreement, or the increased risk of shortfall at closing. The testimony of several senior bank officials confirmed this credit for asset sales and the Banks reduced their mark-to-market losses on the basis of the promise from Apollo.

59.    A second secret assurance made by Apollo to the Banks concerned an understanding that the terms of the committed financing were not the "real" terms. Before the Commitment Letter was signed, Apollo and the Banks agreed that the capped interest rates were illusory. Apollo and the Banks fully intended to adjust them to insulate the Banks from syndication losses, regardless of the assurances made that the interest rates were capped. As Josh Harris told a Deutsche Bank representative, "Trust us. We won't leave you hung. We've priced deals through the caps in the past. We gave Credit Suisse the same assurances, and they are fine." Chris Owen of Deutsche Bank wrote: "Everyone is nervous about the market. Epley and Cole were on with Josh for a while, lots of F-bombs were dropped. Credit Suisse only raised caps 25 basis points, plus Josh's word, they would not lose money." In short, the Banks' understanding before the Commitment Letter was even signed was that the capped interest rates would be modified and the Banks would not lose money.

60.    Apollo and the Banks also agreed they would be flexible about financial covenants in the financing, and might impose them to protect the Banks, again without regard to the fact that they had represented that there were, and would be, no such covenants. Internal bank documents repeatedly reflect the Banks' secret agreement with Apollo to protect the Banks through undisclosed covenants. As one email from the Banks stated: "To this point, I've been trusting our relationship with Apollo to get us an extra rate or a covenant and have had an explicit conversation on that point." Another email responded: "This is where we have ended

up" and documented the four changes that the Banks and Apollo have agreed to, including "a willingness to work with us on the covenant issue in the event that market is challenging. The deal team feels very good about these changes and assurances."

61.     Also among the secret assurances and agreements between Apollo and the Banks, never disclosed to Huntsman or plaintiffs, was a promise that Apollo would "work with them" as "partners" on the financing, prior to closing the merger, in order to:

- insulate the Banks from market losses on the debt, despite the express representation that the Banks had assumed and would bear all such syndication losses;

- cure violations of internal lending limits created by the financing commitment, which the Banks believed exceeded what they were authorized to fund;

- ensure that the Banks did not have to "write the full check" at closing of the merger, because the Banks knew that neither one of them, nor both of them together, had the financial wherewithal, capital, or permissible lending limits to permit them to do so. As noted by a high-level Deutsche Bank official who actually signed the Commitment Letter: "Do we know how they want to deal with the fact that neither us, nor Credit Suisse nor both of us combined, can underwrite the entire check?"  This is the same person that, upon learning that Apollo was not putting in equity on July 12, 2007, the date of the merger agreement, stated to her Deutsche Bank colleagues:  "We are doomed."

62.     Additionally, in order to induce plaintiffs to purchase shares of Huntsman stock—including portions of the 56 million-share block previously owned by MatlinPatterson—Apollo and the Banks agreed to remove the MAC from the Commitment Letter so that the Banks could not unilaterally declare a MAC and terminate the financing on the basis of changed circumstances.  In its letter raising the bid to $28 per share, Apollo, through Hexion and in agreement with the Banks, declared:  "We have removed any reference in our debt financing commitments to the material adverse effect condition in our proposed merger agreement."

63. Apollo first secretly agreed with Credit Suisse to allow the Banks to consent to the waiver of the MAC, as noted in a series of internal bank emails: "Malcolm, if we are able to agree to Wingspan's language in the MAC, which is that if Apollo waives the MAC, we have no say and have to fund. David Muletta would like for you to have the conversation with Apollo, that they would not do that without our consent." "Agreed. Told them the third-party language is a nonstarter and that are agreeing to the MAC change would depend on getting a specific verbal understanding from Josh that Apollo would not waive the MAC." "Malcolm, please let me know when you have that conversation with Josh and I will call David at home."

64. In asking Deutsche Bank to agree to take out the MAC from the Commitment Letter, Josh Harris of Apollo pleaded with Tom Cole, the bank's most senior investment banker on the deal: "Tom, as usual you are behind CSFB [(Credit Suisse First Boston)] . . . but I realize this is tough ask. This will clearly hurt us. Is there anything to do here? Can we bring you up to a competitive level? Would a conversation with Tommy help? This could cost us. We just want to buy the company." Tom Cole agreed with Josh Harris on removing the MAC already agreed by the other funding bank: "Credit Suisse has agreed to take out the business MAC and rely on the business MAC in the purchase agreement." "As I said to Josh, I am happy to get on the phone with him and Jon Huntsman or anyone else and discuss how tight these letters are." "Kimo called me this morning and I thought I put his mind at ease a bit confirming that we cannot legally walk away from our financing commitments just because you tell us to."

65. When asked whether Huntsman was aware of the Banks agreement with Apollo on the MAC, Peter Huntsman testified: "Absolutely not. Absolutely not. We would be

transferring one of the most fundamental protections that we are looking for on the certainty of financing to the very party that we didn't trust."

66.     Also unknown to Huntsman and plaintiffs was the fact that the Banks did not believe they could fund the full amount covered by the Commitment Letter because it was in excess of their internal lending limits and risk management policies.  Indeed, one day before Huntsman accepted Hexion's bid, a Deutsche Bank employee emailed a colleague that the proposed merger agreement contains a financial breach section that would allow the Banks to be sued if they do not honor their commitment.  The colleague's response was "I think they should just sue us now."  In other words, the Banks knew from the outset that they could not fulfill their obligations under the Commitment Letter.   The Banks therefore agreed to provide the Commitment Letter only after receiving a secret assurance from Apollo that they never would have to fund the full amount because Apollo would take care of this issue for the Banks by selling down the Banks' exposure prior to closing.  On the day the Commitment Letter was signed by Deutsche Bank, a "highly-confidential memorandum" was prepared internally describing the perspective of the syndication team to sell the debt and why the bank could rely on Apollo's promises: "Apollo management is one of the most active and highly regarded sponsors in the market.  They have a long and successful track record in the chemical space, with a number of acquisitions.  They have behaved as a partner to their banks in recent difficult executions and they added a financial covenant to the bank deal for Barry Plastics and pricing the Realogy bonds outside of the caps.  Apollo has given us the same assurances that they will work with us on this deal related to the revolver syndication, covenants and caps."

67.     In addition, Apollo and the Banks knew that Hexion was not going to fund its portion of the breakup fee with its own cash because it was strapped for cash.  Instead,

Apollo, through Hexion, obtained financing for that amount from the Banks, with yet another secret assurance that it would refinance the payment upon closing of the merger out of the proceeds of the existing committed financing. This meant that an additional $100 million of the committed financing would be unavailable to the combined entity post-closing.

68. Additionally, when Apollo increased its offer to $28 per share, Apollo and the Banks recognized that this created an "implied equity" commitment on the part of Apollo, because the price increase was not matched by a commensurate increase in the committed financing. This meant that the $28 per share offer could not be fully funded by the Banks because the Banks had never agreed to provide that much funding. According to a Deutsche Bank senior credit official, the price increase meant that the amount of consideration to be paid exceeded by $250 million the amount of committed debt.

69. When the ticking fee was added to the $28 per share price, Apollo realized that the implied equity that would have to be funded by Apollo at closing had risen to $308 million. The Banks discussed with Apollo the fact that the bid price had increased by an amount that was $308 million more than the increase in the debt financing. The Banks had not extended additional debt to cover the price increase from the 8% ticking fee. In other words, when the merger agreement was signed, the amount of consideration to be paid exceeded the amount of the committed debt. It was not "fully financed" as Apollo and the Banks repeatedly would represent. Senior Credit Suisse investment banker, Malcolm Price, testified: "So the point we're making here is, as you say, the bid price increased by $308 million more than we increased our debt commitment." As a result, Apollo provided the Banks with assurances that Apollo would nonetheless take care of its partner Banks to ensure they suffered no loss on the financing. The

increase in the offering price and 8% ticking fee only increased the likelihood that the Banks would ask Apollo to live up to its assurances that it would "look after" the Banks.

70.    Neither Apollo nor the Banks ever disclosed the material fact that they believed the increased price and 8% ticking fee created an unfunded gap that would have to be filled with a significant equity contribution from Apollo.  Rather, Apollo and the Banks never intended to perform the Commitment Letter as represented; instead, they viewed the Commitment Letter as little more than a piece of paper containing flexible targets that would be changed to suit the interests of Apollo and the Banks.

71.    No one disclosed to Huntsman or plaintiffs that these secret assurances had been given to the Banks by their "partner," Apollo.  All of these secret side agreements changed the purportedly firm, committed, $15.35 billion financing described in the Commitment Letter.  However, the Commitment Letter never changed.

72.    When Huntsman, its board, and its shareholders accepted Apollo's bid for the merger with Hexion, it was entirely unaware that the side promises by Apollo to the Banks were made.  Indeed, Apollo had falsely promised Huntsman, including in the written Hexion Merger Agreement published in Huntsman's July 13, 2007 Form 8-K, that there were no conditions or terms to the Banks' financing commitment that were not reflected in the Commitment Letter.  Apollo and the Banks knew and intended for plaintiffs to rely on these statements in deciding whether to purchase stock.

**J.    Apollo and the Banks Cause Others to Make Misrepresentations.**

73.    Apollo also caused Hexion to make misrepresentations in the Merger Agreement—misrepresentations that the Banks knew about and benefited from but never corrected.  First, Apollo through Hexion represented and warranted that the committed financing was adequate to fund the acquisition of Huntsman.  Apollo and the Banks knew this

representation was materially false. Second, Apollo through Hexion represented and warranted that the obligations of the financing sources to fund the commitments under the Commitment Letter were not subject to any conditions other than those set forth in the letter. In reality, Apollo and the Banks knew there were multiple undisclosed and material conditions to the financing that had been agreed upon, but not disclosed. Third, Apollo through Hexion represented and warranted that Apollo and Hexion had no knowledge of any facts or circumstances reasonably likely to result in the funding contemplated in the Commitment Letter not being made available on a timely basis in order to consummate the transaction. Apollo and the Banks knew this representation was materially false—they had agreed that as much as one billion dollars of the committed financing would not be available to be drawn as a result of their secret agreement to give the Banks credit for asset-sale proceeds.

74. Additionally, on September 20, 2007, Credit Suisse met with Apollo to remind Apollo that the increase in the bid price to $28 per share had created a $308 million equity gap in the funding required to close. Credit Suisse also told Apollo that the structure of the financing needed to be changed in order to make it acceptable to the market. In addition to the implied equity requirement, Credit Suisse recommended Apollo agree to include a debt covenant in the financing, even though one was not included in the Commitment Letter. This covenant would have caused the company to go into default if it breached a certain ratio of earnings to debt. Credit Suisse also reminded Apollo of the undisclosed agreement that asset sales were to reduce, dollar for dollar, the funding to be drawn from the loan. The discussion with Credit Suisse during this meeting reflected that $900 million less would be made available under the committed financing than had been represented. As noted by Huntsman's financial

expert: "Less than a month after the commitment letter was signed, the banks had found that there were no takers, no one willing to come in and accept a portion of this debt."

75.     Nevertheless, on September 27, 2007, Craig Morrison and Bill Carter, the CEO and CFO of Hexion, attended the Credit Suisse Chemical Conference, a well-known forum for addressing large institutional investors, where they made a detailed transaction update on the Huntsman merger and affirmed: "Hexion has Fully Committed Financing in Place to Complete the Transaction." Apollo and the Banks expected plaintiffs to rely on those statements.

## K.     Apollo Thwarts the Deal.

76.     In April 2008, the Banks again met with Apollo to express their concerns about financing. By now, the implied equity commitment had ballooned to $785 million. Moreover, the credit markets had turned substantially against the Banks, and they now faced substantial mark-to-market losses on their committed financing. So the Banks made the extraordinary demand that Apollo cause Hexion to abandon the merger entirely and proceed with a different transaction that would require billions less in funding from the Banks. In fact, Deutsche Bank stopped reporting its mark-to-market losses in 2008 on the basis that it had the undisclosed side deals with Apollo, in which Apollo promised Deutsche Bank that it would not lose money on the financing. Huntsman's financial expert testified that the mark-to-market losses for the Banks were $230 million as of September 2007; $1.065 billion as of January 24, 2008; $1.604 billion as of April 2008; $4.910 billion as of September 2008; and $8.295 billion as of October 30, 2008, the scheduled closing date of the merger.

77.     In the wake of the April 2008 meeting, Apollo took steps to scuttle the merger. Eventually, Apollo engaged Duff & Phelps to render an opinion that the consummation of the merger with the committed financing would render the combined entity insolvent. By

carefully filtering and manipulating the information provided to Duff & Phelps, Apollo elicited the extraordinary opinion that the combined entity would be "insolvent."

78.     Having obtained a report calculated to destroy the financing, Apollo then went public with the insolvency opinion, all in an effort to further Apollo's assurances that the Banks would sustain no losses on the transaction.  In a June 18, 2008, press release, Hexion, at the direction of Apollo, publicly disclosed the insolvency opinion and stated—for the first time—that it did not believe financing would be available and did not believe the transaction could be completed.  Prior to that time, neither Apollo nor the Banks disclosed publicly any concerns about the ability to finance the transaction.  At the same time, Apollo, through Hexion, announced that Apollo and Hexion had commenced a lawsuit against Huntsman, the purpose of which was to try to absolve Apollo and Hexion of any liability when the transaction did not close.

79.     Apollo knew and intended that the public disclosure of the insolvency opinion and lawsuit would signal to the market that Hexion was not going to consummate the transaction at $28 per share.  Hexion CEO Craig Morrison testified that he knew the solvency analysis would effectively kill the financing.  Apollo also knew and intended that this would cause Huntsman's share price to drop significantly, which it did.  In fact, on June 19, 2008, Huntsman's stock price fell by more than forty percent (40%) on huge volume selling of over 40 million shares.

80.     Apollo and Hexion's conduct caused Vice Chancellor Lamb of the Delaware Chancery Court to conclude in September 2008 that there was "overwhelming evidence" that Hexion had "knowingly and intentionally breached its covenants and obligations

under the merger agreement." Vice Chancellor Lamb also concluded that Hexion's conduct demonstrated a "lack of good faith."

### L. Huntsman Sues for Fraud.

81. On September 30, 2008, Huntsman filed suit against the Banks alleging causes of action for common law and statutory fraud, tortious interference, negligent misrepresentation, and conspiracy. Huntsman sought damages, including its legal fees, the break-up fee paid to Basell, lost opportunities from the Basell merger, the losses which the Banks avoided by refusing to close, and recovery of the $28 per share merger consideration as well as injunctive relief.

82. As part of the Huntsman litigation, the Banks filed a summary judgment motion claiming that Huntsman could not recover the $28 per share merger consideration. Specifically, the Banks explained, "because only the Huntsman shareholders could have received the merger consideration in a but for scenario, their alleged injury is distinct from any injury that could have been suffered by the Huntsman Corporation itself. And because that alleged injury is distinct, the right to seek the merger consideration as relief can only be the shareholders' not the corporation's."

83. Huntsman and the Banks settled their claims on June 23, 2009, obtaining mutual releases. Plaintiffs were not parties to the settlement agreement, nor were they third-party beneficiaries. Thus, the settlement agreement between Huntsman and the Banks did not release any of plaintiffs' claims. Additionally, as the Banks previously explained, because Huntsman was not entitled to the merger consideration, this settlement could not, and did not, release the Banks from plaintiffs' claims for the merger consideration.

**M.  Stark Suffered Substantial Losses Caused by Defendants' Fraud**

84.     Defendants' misrepresentations that the deal for Hexion to acquire Huntsman at $28 per share was "fully financed" and "rock solid," and their failure to disclose numerous side deals that made that financing illusory, caused plaintiffs to suffer significant losses.  Stark seeks to recover damages resulting from its purchases and sales of Huntsman stock from Credit Suisse, as well as damages resulting from its market purchases and sales of millions of shares of Huntsman stock.

**First Cause of Action**
(Intentional Misrepresentation)

85.     Defendants knowingly made materially false representations about the nature of the financing for the Huntsman merger.

86.     Defendants knew that it was especially likely that investors such as Stark would rely on their false representations about the nature of the financing.

87.     Defendants made these false representations with the intent to defraud Stark and for the purpose of inducing Stark to purchase Huntsman stock.

88.     Stark justifiably relied on defendants' representations regarding the nature of the financing for the Huntsman merger when deciding to purchase Huntsman stock.

89.     As a result of defendants' false representations upon which Stark relied, Stark purchased Huntsman stock and suffered damages. Defendants are liable to Stark for actual damages, exemplary damages, reasonable attorneys' fees and costs, and expert witness fees.

## Second Cause of Action
### (Negligent Misrepresentation)

90.     Stark realleges here the material facts pleaded above.

91.     Defendants made materially false representations about the nature of the financing for the Huntsman merger.

92.     Defendants were negligent in making these false representations.

93.     Stark believed that these false representations were true and justifiably relied upon them when deciding to purchase Huntsman stock.

94.     As a result of defendants' false representations upon which Stark relied, Stark purchased Huntsman stock and suffered damages. Defendants are liable to Stark for actual damages, exemplary damages, reasonable attorneys' fees and costs, and expert witness fees.

## Third Cause of Action
### (Strict Liability Misrepresentation)

95.     Stark realleges here the material facts pleaded above.

96.     Defendants made materially false representations about the nature of the financing for the Huntsman merger.

97.     Defendants made these materially false representations as facts based on their own personal knowledge.

98.     Defendants had an economic interest in the Huntsman merger and in inducing investors such as Stark to purchase Huntsman stock.

99.     Stark believed that these false representations were true and justifiably relied upon them when deciding to purchase Huntsman stock.

100.    As a result of defendants' false representations upon which Stark relied, Stark purchased Huntsman stock and suffered damages. Defendants are liable to Stark for actual damages, exemplary damages, reasonable attorneys' fees and costs, and expert witness fees.

### Fourth Cause of Action
(Conspiracy to Defraud)

101.    Stark realleges here the material facts pleaded above.

102.    Defendants agreed to act together in concert to defraud investors such as Stark as to the true nature of the financing for the Hexion - Huntsman merger. Defendants did so in order to induce investors such as Stark to purchase Huntsman stock.

103.    In furtherance of this conspiracy, defendants entered into secret agreements concerning the financing for the Hexion - Huntsman merger and made numerous misrepresentations regarding the financing which are detailed above and upon which Stark justifiably relied.

104.    As a result of this conspiracy, Stark purchased Huntsman stock and suffered damages. Defendants are liable to Stark for actual damages, exemplary damages, reasonable attorneys' fees and costs, and expert witness fees.

### Fifth Cause of Action
(Aiding and Abetting Fraud)

105.    Stark realleges here the material facts pleaded above.

106.    Defendants were aware of and aided and abetted the fraudulent representations that Hexion made to investors including, without limitation, Hexion's fraudulent representation that there were no conditions to the performance of defendants' Commitment Letter that were not reflected in its text.

107.    Defendants desired and intended their conduct to assist Hexion in making these fraudulent representations to investors in order to induce such investors to purchase Huntsman stock.

108.    As a result, Stark purchased Huntsman stock and suffered damages. Defendants are liable to Stark for actual damages, exemplary damages, reasonable attorneys' fees and costs, and expert witness fees.

## Demand for Jury Trial

Plaintiffs demand their right to have a trial by jury in this matter.

## Prayer for Relief

Plaintiffs respectfully request that, after a trial by jury, judgment be entered in their favor and they be awarded:

    a.   actual damages;

    b.   exemplary damages in an equally substantial amount;

    c.   costs and reasonable attorneys' fees as allowed by law;

    d.   pre-judgment interest;

    e.   post-judgment interest; and

    f.   all other relief, either in law or in equity, that is just and appropriate.

Dated this 13th day of June, 2014

Respectfully submitted,

HALLING & CAYO, S.C.

By:  s/Michael H. Schaalman
     Michael H. Schaalman
     State Bar No. 01015424
     Halling & Cayo, S.C.
     320 E. Buffalo St., Suite 700
     Milwaukee, Wisconsin 53202


     R. Paul Yetter
     Texas State Bar No. 22154200
     Yetter Coleman, LLP
     909 Fannin, Suite 3600
     Houston, Texas 77010
     (713) 632-8000
     (713) 632-8002 (Fax)


     ATTORNEY FOR PLAINTIFFS