# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**STARK MASTER FUND LTD. and**
**STARK GLOBAL OPPORTUNITIES**
**MASTER FUND LTD.,**

      Plaintiffs,

      v.                                 **Case No. 14-CV-689**

**CREDIT SUISSE SECURITIES (USA) LLC,**

      Defendant.

---

## ORDER

---

      Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. (collectively "Stark") allege that Credit Suisse Securities (USA) LLC, ("Credit Suisse") misrepresented the nature of the financing for a proposed merger between Huntsman Corporation and Momentive Specialty Chemicals, f/k/a Hexion Specialty Chemicals, Inc. According to Stark, the Banks' misrepresentations caused them to retain their position in Huntsman stock and to purchase additional shares. Ultimately, the merger collapsed, and Stark is now suing Credit Suisse[1] for intentional misrepresentation, negligence, strict liability misrepresentation,

---

[1] Stark also sued Apollo Global Management LLC and Apollo Management Holdings, L.P. (collectively, "Apollo"), and Deutsche Bank Securities USA Inc. ("Deutsche Bank"). Stark voluntarily dismissed Apollo on June 30, 2016. ECF No. 110. The Court granted Deutsche Bank's motion to dismiss for lack of personal jurisdiction, ECF No. 46, and terminated Deutsche Bank as a party on December 2, 2016. ECF No. 130.

conspiracy to defraud, and aiding and abetting fraud.

The Stark plaintiffs are British Virgin Islands corporations, but they trade securities through Stark Offshore Management LLC and Stark Global Opportunities Management LLC, investment managers located in St. Francis, Wisconsin. Credit Suisse is an LLC whose sole member is Credit Suisse (USA), Inc., which is a Delaware corporation with its principal place of business in New York.

On August 2, 2016, this matter was reassigned to this Court due to the unavailability of Judge Randa. All parties consented to magistrate judge jurisdiction. *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b).

On August 25, 2017, Credit Suisse filed a motion for summary judgment. ECF No. 159. Briefing on the motion was completed on October 13, 2017. *See* ECF Nos. 160, 167, 175. Counsel provided oral argument on November 8, 2017 (ECF Nos. 195; 199), and the matter is ripe for decision.

The Court again extends its appreciation to counsel for their outstanding written and oral advocacy on this case.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, these facts are drawn from the parties' statements of fact and responses thereto. *See* ECF Nos. 162, 170, 171, 177. The Court also notes that Credit Suisse has offered a "reply" in support of their own statement of facts. ECF No. 176. This document is neither contemplated nor permitted by this District's Local Rules. *See* Civil L. R. 56(b)(3). The Court has therefore ignored it. *See also J.M. v. City of Milwaukee*, Case No. 16-CV-507-JPS, 2017 U.S. Dist. LEXIS

56075, at *27 n. 8 (E.D. Wis. Apr. 12, 2017) (same).

Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. are two funds associated with Stark Investments. Statement of Fact by Credit Suisse Securities (USA) LLC ("CS"), ECF No. 162, ¶ 1. Between 2006 and 2008, Plaintiffs pursued several different investment strategies, including "risk arbitrage" or "risk arb" investments. CS ¶ 2. Risk arbitrage investments carry risks, including the risk of "deal break," or the possibility that an announced merger might fail to close. CS ¶ 5; Plaintiffs' Response to Credit Suisse Securities (USA), LLC's Statement of Facts ("PRCS"), ECF No. 170, ¶ 5.

Credit Suisse was familiar with Stark, as it provided banking and brokerage services and collected fees totaling over $100 million between 2006 and 2008. *See* Stark Plaintiffs' Statement of Additional Facts ("Stark"), ECF No. 171, ¶ 48; Credit Suisse Securities (USA) LLC's Response to the Stark Plaintiffs' Statement of Additional Facts ("CSR"), ECF No. 177, ¶ 48. The "articulated public strategy" of Credit Suisse was not to distinguish itself as different branches or entities but to sell services to customers as a single, global bank. Stark ¶ 64.

Stark began to acquire Huntsman shares in 2006. CS ¶ 10; PRCS ¶ 10. On June 25, 2007, the Huntsman Board of Directors, on the recommendation of its Transaction Committee, entered into the Basell Merger Agreement, which provided for the acquisition of Huntsman by Basell for $25.25 per share of Huntsman common stock, rejecting a competing offer from Apollo, on behalf of Hexion, of $26.00 per share. CS ¶ 11; Stark ¶¶ 5 & 7.

As of June 25, 2007, Stark owned approximately 2.9 million Huntsman shares. CS ¶ 12; Stark ¶ 6; CSR ¶ 6. On June 26, 2007, Huntsman publicly announced that it had entered into the Basell Merger Agreement, pursuant to which Huntsman would be acquired by Basell for $25.25 per share. CS ¶ 13. Stark's investments in Huntsman between 2006 and the announcement of the Basell merger on June 26, 2007, were not made in reliance on any statements about financing for the Hexion Merger because it was not in existence. CS ¶ 14. Stark's investments in Huntsman before the June 26, 2007, announcement of the Basell merger met or exceeded Stark's expectations because Huntsman's stock increased in value following the announcement. CS ¶ 15.

Apollo badly wanted to do the Huntsman deal. Stark ¶ 9. On July 3, 2007, Huntsman announced that it had received a revised bid from Hexion offering to acquire Hunstman for $27.25 per share. CS ¶ 16; Stark ¶ 10. After the June 26, 2007, announcement of the Basell deal, but before the July 3, 2007, announcement of Hexion's revised bid for Huntsman at $27.25 a share, Stark acquired additional Huntsman stock, bringing their total holdings of Huntsman stock as of July 3, 2007, to approximately 5.79 million shares. CS ¶ 17. Stark's purchases of Huntsman shares prior to the July 3, 2007, announcement of Hexion's revised bid for Huntsman were not made in reliance on any statements about financing for Hexion's revised offer to acquire Huntsman, which had not been announced at the time. CS ¶ 18.

On July 8, 2007, Josh Harris of Apollo sent a letter to the Huntsman board of

directors which stated, among other things: "As your advisors have agreed with us, our financing commitments are of the highest quality and strength available in U.S. markets. Credit Suisse is a leading lender in this industry and to private equity sponsors generally; they have, to our and their knowledge, never failed to fund a commitment when required to do so. . . . To quote one of your advisors, these papers are 'rock solid.' . . . Our proposal is firm, fully financed." Stark ¶ 24. Stark alleges that this statement was based upon Malcom Price's email assurance sent to Jordan Zaken on July 6, 2007, that "CS has never walked away from a commitment in a US financing." *Id.*; *but see* CSR ¶ 24 (Credit Suisse disputes that Mr. Harris's letter was based upon any statement by Credit Suisse).

Before accepting Apollo's bid, Huntsman negotiated several conditions to the Apollo offer that tightened up the financing. These included removing the material adverse clause from the Commitment Letter, adding a "hell-or-high-water provision" to the merger, removing any financing outs, securing the right to compel Apollo/Hexion to sue the banks, and allowing the solvency opinion to be delivered by the Huntsman CFO or an outside party. *See* Stark ¶ 11; CSR ¶ 11. The Vice Chancellor in the Delaware litigation wrote that due to "Apollo's admittedly intense desire for the deal," Huntsman had "significant negotiating leverage," and was able to get Hexion "to commit to stringent deal terms" which were "more than usually favorable to Huntsman." Stark ¶ 12. Notably, the duty to fund would not be conditioned on the banks being able to syndicate part of the debt to other banks. Stark ¶ 13.

On July 12, 2007, Huntsman announced that it had terminated the Basell Merger Agreement and entered into the Hexion Merger Agreement, pursuant to which Huntsman was to be acquired by Hexion at $28.00 per share. CS ¶ 19; Stark ¶ 10. Aspects consistently considered by Huntsman's Transaction Committee and Board in reviewing the merger proposals were "the certainty of closing" and the banks' financing. Huntsman relied on these factors in ultimately terminating the Basell merger and accepting the Apollo-Hexion transaction. Stark ¶ 26; CSR ¶ 26. Promptly upon losing the Huntsman merger opportunity, Basell went out and reached an agreement to acquire another chemical company, Lyondell, and it subsequently closed on that deal in December 2007, in an all-cash transaction with a total value of approximately $20 billion. Stark ¶ 65.

Stark was aware that even though Huntsman had entered into the Hexion Merger Agreement, there were no guarantees that the merger would close or that Stark would receive the $28.00 per share merger consideration contemplated by the definitive merger agreement. CS ¶ 20. Pursuant to the July 11, 2007, Commitment Letter, Credit Suisse and Deutsche Bank each agreed to provide a fixed amount of financing to Hexion for the Hexion Merger. CS ¶ 21. The Commitment Letter promised that the duty to fund would not be conditioned on the banks being able to syndicate part of the debt to other banks. Stark ¶ 28; *see* CSR ¶ 28. Banks consider the ability to syndicate debt when engaged in financing leveraged buyout conditions. *See* Stark ¶ 29; CSR ¶ 29.

The Commitment Letter contained seven conditions precedent to the Banks'

obligations to fund the Hexion Merger, including receipt of a "customary and reasonably satisfactory" certificate or opinion with respect to solvency of the combined post-merger entity:

> The Arrangers shall have received (i) customary and reasonably satisfactory legal opinions, corporate documents and certificates (including a certificate from the chief financial officer of the Borrower or the chief financial officer of Wingspan or an opinion from a reputable valuation firm with respect to solvency (on a consolidated basis) of the Borrower and its subsidiaries on the Closing Date after giving effect to the Transactions) (all such opinions, documents and certificates mutually agreed to be in form and substance customary for recent financings of this type with portfolio companies controlled by affiliates of or funds managed by the Sponsor); and (ii) payment of fees and expenses required to be paid hereunder and/or in the Fee Letter to the extent involved on or prior to the Closing Date.

CS ¶ 22.

The Commitment Letter also contained a merger clause, a no-oral-modifications clause, and dispute resolution, choice-of-law, and mandatory forum clauses.[2] CS ¶ 23. The Commitment Letter was disclosed to Huntsman's senior management and Board of Directors before the Hexion Merger Agreement was executed on July 12, 2007. CS ¶ 25. Huntsman did not disclose the Commitment Letter in its Preliminary or Definitive Proxy Statements related to the Hexion Merger, or in any other SEC filing. CS ¶ 26; PRCS ¶ 26. The Commitment Letter was not made public when the deal was announced or at any time during Stark's investments in Huntsman from 2006, through May 2008. CS ¶ 27; PRCS ¶

---

[2] Stark notes that the mandatory forum clauses extend only to the parties to the Commitment Letter. PRCS ¶ 23.

27. Stark did not have a copy of the Commitment Letter while invested in Huntsman from 2006, through May 2008, but expected it would contain industry standard conditions precedent to the Banks' financing commitments. CS ¶¶ 28-29; PRCS ¶¶ 28-29; *see also* Transcript of Oral Argument held November 8, 2017, ECF No. 199, at 48; 51; 57; 58. Stark understood that making investments in Huntsman without knowledge of the specific terms and conditions in the Commitment Letter carried risks. CS ¶ 30. The Commitment Letter was first publicly disclosed on October 7, 2008. CS ¶ 31.

In connection with the Hexion Merger, Huntsman and Hexion issued press releases and made filings with the SEC regarding the announced merger, some of which stated that the merger was fully financed, fully committed, and/or not subject to a financing condition. CS ¶ 32; Stark ¶ 34. Stark would generally review any press release, news report, or SEC filing related to the Hexion Merger shortly after it became publicly available. CS ¶ 8. Stark relied on the information contained in the publicly available documents related to the Hexion Merger, including SEC filings and press releases, in making decisions to acquire and hold Huntsman shares. CS ¶ 9; PRCS ¶ 9.

Statements that the merger was not subject to a financing condition meant that the buyer, Hexion, would remain contractually obligated under the Hexion Merger Agreement to consummate the transaction even if the financing contemplated under the Commitment Letter was not available and Hexion was unable to obtain alternative financing. CS ¶ 33. Statements that the merger was

"fully financed" or had "fully committed" financing meant only that a financing commitment existed whereby Credit Suisse and Deutsche Bank had agreed to provide a fixed amount of financing that the sponsor determined would be sufficient for the deal under a set of terms and conditions stipulated in the Commitment Letter. CS ¶ 34. Stark disagrees and asserts that Mr. Purcell testified that "fully financed" means no financing outs, other than the customary and standard conditions precedent. PRCS ¶ 34.

On July 12, 2007, Huntsman issued a press release titled "HUNTSMAN TO BE ACQUIRED BY HEXION FOR $28.00 PER SHARE," in which Huntsman announced that it had agreed to be acquired by Hexion for $28.00 per share. The press release and the Form 8-K to which to was attached as an exhibit, both contain the following language in a section titled "CAUTIONARY STATEMENTS":

> These statements involve risks and uncertainties including, but not limited to, actions by regulatory authorities, market conditions, the Company's financial results and performance, consummation of financing, satisfaction of closing conditions, actions by any other bidder and other factors detailed in risk factors and elsewhere in Company's Annual Reports on Form 10-K and other filings with the Securities and Exchange Commission.

Stark acknowledged that the press release and Form 8-K disclosed a risk that the transaction might not close because financing might not be available. CS ¶¶ 35-36. Also, on July 12, 2007, Hexion issued a press release titled "Hexion Specialty Chemicals, Inc. To Acquire Huntsman Corporation For $28.00 Per Share in Cash," in which Hexion announced that it had entered into an agreement with Huntsman to acquire Huntsman for $28.00 per share. CS ¶ 37. Hexion's July 12, 2007, press

release contains the following language in a section titled "Forward-Looking Statements":

> Important factors that could cause actual results to differ materially from those in the forward looking statements include, but are not limited to: market conditions, availability and terms of acquisition financing, satisfaction of closing conditions, actions by Hexion or Huntsman, economic factors such as an interruption in the supply of or increased pricing of raw materials due to natural disasters, competitive factors such as pricing actions by our competitors that could affect our operating margins, and regulatory factors such as changes in governmental regulations involving our products that lead to environmental and legal matters.

CS ¶ 38. Hexion's July 16, 2007, Form 8-K contains the following language:

> Statements in this Form 8-K that are not strictly historical may be 'forward-looking' statements, which involve risks and uncertainties. These include risks and uncertainties relating to financing the merger and satisfaction of the conditions to the merger, among others, as set forth in the companies' respective filings with the Securities and Exchange Commission.

CS ¶ 39; PRCS ¶ 39. Elizabeth Clark, Stark's portfolio manager responsible for the Huntsman investments, understood that Hexion's July 12, 2007, press release disclosed a risk that the transaction might not close for reasons related to the "availability and terms of acquisition financing" and "financing for the merger." CS ¶ 40. On July 13, 2007, Huntsman filed the Hexion Merger Agreement with the SEC as an exhibit to its Form 8-K filed on the same date. CS ¶ 41.

Section 5.12 of the Hexion Merger Agreement contains the following language:

> [Hexion] shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and consummate the Financing on the

> terms and conditions described in the Commitment Letter including (i) using reasonable best efforts to (x) satisfy on a timely basis all terms, covenants and conditions set forth in the Commitment Letter. . . . If any portion of the Financing becomes unavailable on the terms and conditions contemplated in the Commitment Letter or the Commitment Letter shall be terminated or modified in a manner materially adverse to [Hexion] for any reason, [Hexion] shall use its reasonable best efforts to arrange to obtain alternative financing from alternative sources in an amount sufficient to consummate the Transactions.

CS ¶ 42. Ms. Clark and Michael Keough, another Stark trader involved in the transaction, understood that the Hexion Merger Agreement disclosed the existence of terms and conditions contained in the Commitment Letter. CS ¶ 43. Mr. Keough and Ms. Clark understood that the Hexion Merger Agreement disclosed a risk that Hexion might not be able to draw on the financing committed under the Commitment Letter if the terms and conditions therein were not satisfied. CS ¶ 44.

The publicly available Merger Agreement also states that "[t]he obligations of the financing sources to fund the commitments under the Commitment Letter are not subject to any conditions other than as set forth in the Commitment Letter." Stark ¶ 35; *see also* CSR ¶ 35 (noting that the terms and conditions in the Commitment Letter were not disclosed to the public). Stark's analysts received and reviewed publicly available documents indicating that the deal was "fully financed." Stark ¶ 38. Stark relied on public assurances about the security and certainty of the financing.[3] Stark ¶ 41.

---

[3] Credit Suisse disputes that it made any public assurances about the financing. CSR ¶ 41.

Following the announcement of the Hexion Merger Agreement on July 12, 2007, Stark continued to purchase shares of Huntsman stock through September 19, 2007. CS ¶ 45. At the time the Hexion Merger was announced, MatlinPatterson owned more than 30% of Huntsman's common stock and had two seats on Huntsman's board of directors. CS ¶ 46. MatlinPatterson agreed to approve the Hexion Merger so long as it was permitted to sell approximately 57 million of its 76.8 million Huntsman shares before the merger closed. CS ¶ 47. In July and August 2007, Credit Suisse arranged and served as the underwriter for a secondary offering of 56,979,062 shares of Huntsman stock that MatlinPatterson had held. CS ¶ 48.

On July 31, 2007, Huntsman filed a Form S-3 Registration Statement (the "Prospectus") with the SEC in anticipation of the secondary offering of shares from the MatlinPatterson block. CS ¶ 49. The Prospectus contained a section titled "Risks Related to the Pending Sale of Our Company." One such risk factor, which appeared in bold and italic typeface was: "If the banks that have provided commitment letters for the funds to complete the Merger are not required or refuse to fund, Hexion will have to seek other financing to complete the Merger, which financing may not be available." The Prospectus further stated:

> Hexion has obtained commitment letters for senior secured credit facilities and a senior secured bridge facility with Credit Suisse and Deutsche Bank to be made available to Hexion and/or one or more of its subsidiaries for purposes of, among other things, financing the Merger Consideration. Hexion's ability to draw on the proposed loan facility is subject to the satisfaction of certain conditions. . . . Although Hexion expects that it will be able to draw on the proposed loan

> facility, in the event Hexion is unable to do so, Hexion will be forced to seek substitute financing to raise the necessary funds to pay the Merger Consideration. Such substitute financing may be unavailable. In addition, Apollo is not obligated to contribute additional equity to us or Hexion in order to consummate the Merger.

CS ¶ 50. The Prospectus also identified risk factors related to whether the Hexion Merger would be approved by antitrust authorities. CS ¶ 51.

Mr. Keough and Ms. Clark understood that the Prospectus disclosed the existence of terms and conditions in the Commitment Letter and a risk that Hexion might not be able to draw on the financing committed under the Commitment Letter. CS ¶¶ 52-53. On August 2, 2007, Stark purchased 6.5 million Huntsman shares from the MatlinPatterson Block from Credit Suisse, at a price below the announced merger price. CS ¶ 57; PRCS ¶ 57; Stark ¶ 45. This purchase brought Stark's total shares owned to approximately 18.5 million shares. *See* Stark ¶ 46; CSR ¶ 46.

Stark voted their Huntsman shares in favor of the proposed merger with Hexion. CS ¶ 60; Stark ¶ 47. The proxy statements filed with the SEC in connection with the Hexion Merger set forth risks regarding financing for the transaction. Both the Preliminary Proxy Statement and the Definitive Proxy Statement, filed by Huntsman with the SEC on August 10, 2007, and September 12, 2007, respectively, contain the following language:

> Consummation of the merger is not subject to a financing condition; however, if Hexion's financing commitments are terminated or not fulfilled and Hexion is unable to find alternative financing arrangements, Hexion may not be able to consummate the Merger. There can be no assurance that these or the other conditions to

consummation of the merger will be satisfied or waived.

The Preliminary Proxy Statement and Definitive Proxy Statement further stated:

> The Transaction Committee also considered a variety of risks and
> other potentially negative factors concerning the merger agreement
> and the merger, including the following: . . . The risk of deterioration in
> the financial markets over the period of time necessary to obtain the
> required regulatory approvals and the possibility that Hexion will be
> unable to obtain the necessary financing proceeds, including the debt
> financing proceeds from its lenders.

The Preliminary Proxy Statement and Definitive Proxy Statement further stated:

> Hexion received debt financing commitments on July 3, 2007, from
> affiliates of Credit Suisse and Deutsche Bank. Pursuant to the debt
> financing commitments, and subject to their terms and conditions,
> such financial institutions have committed to provide debt financing in
> an aggregate amount which Hexion has represented to Huntsman will
> be sufficient to complete the transaction.

CS ¶ 61.

The Preliminary Proxy Statement declared that there were only "limited conditions" to closing. Stark ¶ 36.

The leveraged buyout ("LBO") market dried up shortly after the Huntsman-Hexion commitment was signed (i.e. July 11, 2007). Stark ¶ 14; CSR ¶ 14. In particular, Credit Suisse was concerned that it would be left holding a very large chunk of the Hexion commitment that it had hoped to syndicate to other banks. Stark ¶ 16. If the value of the loan Credit Suisse was committing to declined due to changes in the credit markets and the banks were unable to syndicate, Credit Suisse would be required to show a so-called "mark to market" loss on its books and, as a result, might cease making additional leveraged financing commitments. Stark

¶ 17; CSR ¶ 17. Deutsche Bank also expressed concerns about the transaction. Stark ¶ 18.

The overall credit market deteriorated badly in the summer and fall of 2007, which meant that as early as September of 2007, Credit Suisse had to book significant mark-to-market losses for the Hexion loan, which was the largest exposure for the bank at the time. Stark ¶ 51. By the end of December 2007, Credit Suisse's mark-to-market loss was near $365 million. By June 17, 2008, it exceeded $1 billion. Stark ¶ 52; *see also* CSR ¶ 52.

In January 2008, the credit department at Credit Suisse told the leveraged finance department that an option being considered was to cease new business so that the commitment to leveraged finance would not increase. *See* Stark ¶ 52; CSR ¶ 53. The leveraged finance people noted that the lost opportunity cost if that were to happen would be $500 million to $1 billion in underwriting revenue. Stark ¶ 54. A meeting was held in Davos, Switzerland, in early 2008 between Leon Black of Apollo and several senior executives at Credit Suisse. Credit Suisse had a $180 million direct investment in Apollo. According to the notes prepared for Credit Suisse before the meeting, "Credit Suisse is trusting Apollo to deliver on its commitment to CS when Hexion comes to market." Stark ¶ 55; *see also* CSR ¶ 55.

In conjunction with a meeting with Deutsche Bank and Apollo in April 2008, Credit Suisse prepared a draft document concerning points to be presented regarding proposed changes to financing, including that the changes would help reduce "otherwise catastrophic losses for CS and DB." Stark ¶ 56.

Towards the end of September 2007, Stark concluded that it had too much risk in general in risk arbitrage because the downside was becoming essentially unquantifiable. *See* CS ¶¶ 67-68; PRCS ¶ 68. Stark attributed the difficulty of quantifying downside risk to a number of factors, including the market, changes in the global economy, and changes in the U.S. macro economy. CS ¶¶ 69; 75. Mr. Keough decided to reduce Stark's exposure across the entire portfolio of risk arbitrage investments and began to sell down their position in Huntsman beginning in October 2007. CS ¶¶ 70-71; PRCS ¶ 71.

Even as Stark was unwinding its position in Huntsman, it continued to believe that the Hexion Merger would close. CS ¶ 72; *but see* Stark ¶ 63 (Stark alleges it concluded the Huntsman/Hexion deal would not close and mitigated its risk by closing out its position in Huntsman). Stark knew when exiting its position in Huntsman that it would not receive the merger consideration if the merger closed. CS ¶ 73. Stark sold all its Huntsman shares by May 13, 2008, with the settlement date of their final sale on May 16, 2008. CS ¶ 78.

Ms. Clark testified that there were no occasions between 2006 and 2008 when Stark was considering divesting a specific quantity of Huntsman shares but decided not to do so because of any statements made by Credit Suisse. CS ¶ 79-80. Similarly, Mr. Keough testified that there was never a time in 2007 or 2008 when Stark was considering selling its Huntsman shares but decided to retain them because of any statements related to financing for the Hexion merger. CS ¶¶ 79-80.

Before and after the Commitment Letter was signed, Credit Suisse discussed

16

issues relating to syndication with Apollo. Conversations between lending banks and financial sponsors relating to syndication issues are consistent with industry practice and not atypical. CS ¶ 81; PRCS ¶ 81. In September 2007, Credit Suisse proposed modifications to the Commitment Letter to Apollo, including the conversion of a portion of the committed financing into an asset-backed revolving credit facility and the addition of a debt leverage ratio covenant to make the debt more attractive in the syndication market. CS ¶ 82.

On November 16, 2007, Credit Suisse, Deutsche Bank, Hexion, and certain of their affiliates executed a Side Letter Agreement, which provided for the conversion of a portion of the committed financing into an asset-backed revolving credit facility and the addition of debt leverage ratio covenant, "the level and initial test date" of which were to be "determined prior to the launch of the syndication of the facilities by [Hexion] in its sole discretion." CS ¶ 83. The Side Letter Agreement further provides that, in the event of a conflict, any provision of the Side Letter Agreement that would adversely impact the amount of financing available to close the merger would have no effect:

> Each party hereto hereby confirms that, notwithstanding the execution and delivery of this letter agreement, the Commitment Letter remains in full force and effect. Notwithstanding anything to the contrary herein, in the event that the changes to the financing contemplated pursuant to this letter agreement could have any adverse effect on the availability of the full amount of the facilities on the closing date under the Merger Agreement or the consummation of the Transactions (including for the avoidance of doubt, any delay in the closing date under the Merger Agreement beyond the date provided in the Merger Agreement) or otherwise has any adverse effect on the Borrower's liabilities or obligations under the Merger Agreement, which shall be

17

> as determined by the Borrower in its good faith judgment, each of us
> hereby agrees that such provisions of this letter agreement (other than
> this Section 4 and Section 5) shall be of no effect.

CS ¶ 84. The Side Letter Agreement was disclosed to and ratified by Huntsman. CS ¶ 85.

On June 18, 2008, Hexion and Apollo sued Huntsman in Delaware Chancery Court, seeking to avoid Hexion's obligation to consummate the merger and alleging that Huntsman had suffered a material adverse condition ("MAC") and that the combined entity would be insolvent. CS ¶ 106; Stark ¶ 57. Huntsman's stock price fell by 38.4% on June 19, 2008, the day after Hexion commenced the Delaware Litigation. CS ¶ 107. Mr. Keough testified that Stark's divestment of their Huntsman shares before the stock drop "saved the firm money" and averted tens of millions of dollars in losses.[4] CS ¶ 108. Malcom Price of Credit Suisse stated that Apollo "turned on" Credit Suisse. Stark ¶ 58; *see also* CSR ¶ 59 (Mr. Price clarified that Apollo turned on Credit Suisse on the day they sued them).

Credit Suisse did not have advance knowledge of Hexion's decision to sue Huntsman in Delaware. CS ¶ 109. Credit Suisse was unaware that Apollo and Hexion had done any analysis of solvency of the combined entity before their filing of the Delaware Litigation. CS ¶ 110. Stark monitored the progress of the Delaware Litigation during its pendency. CS ¶ 111. The Delaware Chancery Court stated

---

[4] Stark notes that the cited testimony of Ms. Clark and the email from Matthew Todd did not relate to the amount of money Stark saved by mitigating its position in Huntsman. PRCS ¶ 108.

that: "[T]he court will not now resolve the question of whether the combined entity would be solvent or not. That issue may arise in the future in the course of this litigation or some related action, but it is not now properly framed by the terms of the merger agreement and the status of the transaction." *See Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 758 (Del. Ch. 2008). CS ¶ 112. Apollo offered to contribute $750 million to support the acquisition, and additional funds were put up by several Huntsman shareholders. Stark ¶¶ 59-60.

Because Credit Suisse believed that the combined Huntsman-Hexion entity would be insolvent, and therefore that the conditions precedent to funding contained in the Commitment Letter had not been satisfied, it did not attend the scheduled closing of the merger in October 2008.[5] CS ¶ 113. Once the closing date passed, Credit Suisse was able to take off its books nearly $4 billion in losses which it had been required by regulation to carry. It thus freed up money that could be used for other loans. Stark ¶ 62.

On September 30, 2008, Huntsman commenced the Texas Litigation against Credit Suisse and Deutsche Bank alleging common law and statutory fraud, tortious interference, negligent misrepresentation and conspiracy claims. CS ¶ 114. On December 15, 2008, Huntsman, Apollo, Hexion and certain affiliates and principals of Hexion and Apollo settled various claims bending between them in actions in Delaware, New York, and Texas. As part of that settlement, Apollo

---

[5] Stark disputes that this was the true reason behind Credit Suisse's failure to attend the closing. PRCS ¶ 113.

agreed to "cooperate in the presentation of Huntsman's claims in the Texas Action Against the Banks," including by making witnesses available for deposition and trial testimony, and Apollo gained a financial interest in the outcome of the Texas Litigation in the form of a right to receive a cash payment from Huntsman equal to 20% of the value of any pre-trial settlement with the Banks in excess of $500 million, provided that such payment would be capped at $425 million. CS ¶ 115. On June 22, 2009, Huntsman settled the Texas Litigation with the Banks. CS ¶ 116. Stark monitored the progress of the Texas Litigation during its pendency. CS ¶ 117. Stark was aware of the settlement of the Texas Litigation at the time it was announced. CS ¶ 118.

In October 2008, while the Texas Litigation was pending, Hexion sued Credit Suisse and Deutsche Bank in the Supreme Court of New York to try to force the Banks to fund the merger. The Banks opposed that litigation on the grounds that the conditions precedent to funding had not been satisfied because the combined entity failed the tests for solvency. CS ¶ 119. On October 31, 2008, Hexion's motions for a temporary restraining order and preliminary injunction to prevent the expiration of the Commitment Letter were denied. CS ¶ 120. The Supreme Court of New York dismissed the New York Litigation with prejudice. CS ¶ 121. Stark monitored the progress of the New York Litigation during its pendency. CS ¶ 122.

On June 18, 2012, MatlinPatterson commenced the MatlinPatterson Litigation against the Banks in Texas alleging fraud by the Banks in connection with the Hexion Merger. CS ¶ 123. The MatlinPatterson Litigation was dismissed

as a derivative claim that had been settled pursuant to the June 22, 2009, Agreement of Compromise and Settlement by and among Huntsman, Credit Suisse, and Deutsche Bank. On May 15, 2014, the Texas trial court's dismissal was affirmed by the Ninth Court of Appeals of Texas. *See* CS ¶ 124; PRCS ¶ 124.

Stark has admitted that their claims in this litigation do not arise out of the prime broker relationship with Credit Suisse in either the Institutional, non-ERISA Customer Agreement between Credit Suisse and Stark Master Fund, Ltd., dated June 21, 2006, or the Institutional, non-ERISA Customer Agreement between Credit Suisse and Stark Global Opportunities Master Fund Ltd. (f/k/a "Stark Event Master Fund Ltd."), dated October 12, 2006. CS ¶ 127.

Stark contends that the following statements made by entities other than Credit Suisse were false or misleading: (i) the June 29, 2007, Apollo letter to Huntsman; (ii) the July 3, 2007, Huntsman press release; (iii) the July 4, 2007, Hexion press release; (iv) the July 6, 2007, Hexion press release; (v) the July 8, 2007, letter from Joshua Harris of Apollo to Huntsman; (vi) the July 9, 2007, Hexion press release; (vii) the July 12, 2007, Hexion press release; (viii) the July 13, 2007, Hexion press release and Form 8-K; (ix) the Merger Agreement published in Huntsman's July 17, 2007, Form 8-K; (x) the September 27, 2007, presentation by Hexion. CS ¶ 66.

Additionally, Stark alleges that the spirit of partnership led to handshake agreements between Credit Suisse and Apollo to modify the terms of the commitment letter, based upon Credit Suisse's trust in Apollo's promises. *See* Stark

21

¶ 21. Credit Suisse vehemently disputes this, arguing that such side agreements did not exist, and further, that there were no unratified modifications to the Commitment Letter. CSR ¶ 21.

Stark alleges that numerous communications between Deutsche Bank, Credit Suisse, and Apollo evidence the reliance on informal "handshake agreements" to "work with" the banks, including:

   i.      Ex. 32, June 22, 2007, email.
   ii.     Ex. 41, June 28, 2007, email.
   iii.    Ex. 44, June 28, 2007, email.
   iv.     Ex. 48, June 29, 2007, mail.
   v.      Ex. 45, June 29, 2007 email.
   vi.     Ex. 49, June 29, 2007, internal memo.
   vii.    Ex. 53, July 5, 2007, email.
   viii.   Ex. 74, July 27, 2007, email.
   ix.     Ex. 82, August 3, 2007, email.
   x.      Ex. 83, November 15, 2007, email.
   xi.     Ex. 88, June 29, 2007, internal memo.
   xii.    Ex. 89, internal Credit Suisse presentation.

Stark ¶ 30. Further, Stark alleges that Credit Suisse and Apollo discussed that Apollo would not waive the material adverse change clause without consent from the banks:

   i.      Ex. 55, July 6, 2007, email.
   ii.     Ex. 62, July 7, 2007, email.

*Id*.

Credit Suisse strongly disputes these allegations on the grounds that there were no informal revisions to the Commitment Letter and the alleged handshake agreements did not exist. CSR ¶ 30.

Stark's expert, Mr. Purcell, testified that the alleged side agreements were

not binding because they were not in writing, and later clarified that because the agreements were not in writing, they would be hard to legally enforce. *See* CS ¶ 86; PRCS ¶ 86; *see also* ECF No. 181-22, at 90-91. Mr. Purcell testified that Apollo "duped" the Banks, clarifying that he believed the Banks assumed "a lot more than what is in this testimony as to what Apollo was saying they agreed to, and from the banks' point of view, I'm saying the banks clearly had a different understanding." CS ¶ 88; PRCS ¶ 88.

Two of the alleged agreements identified by Stark—conversion of a portion of the financing to an asset-backed revolver and the addition of a leverage ratio covenant—were disclosed to and ratified by Huntsman via the Side Letter Agreement. CS ¶ 89. Apollo witnesses testified that they never agreed to reduce the committed financing available to be drawn at closing by the proceeds of any asset sales, that they never agreed to adjust the interest rate caps established in the Commitment Letter, and that they never agreed to insulate the Banks from syndication losses or to provide the Banks with a *de facto* syndication out. CS ¶¶ 90; 93; 96.

An Apollo witness testified that they never agreed not to waive the right to assert a MAC under the Hexion Merger Agreement without the Banks' consent. CS ¶ 97; PRCS ¶ 97. Stark's expert, Mr. Purcell, testified that he did not believe that Apollo agreed to reduce the committed financing available to be drawn at closing by the proceeds of any asset sales. CS ¶ 91. Mr. Purcell testified that he believed, with respect to the interest rate caps, that "Apollo didn't promise anything other than

say, don't worry, trust us." CS ¶ 94.

When Apollo and Hexion ultimately asserted that Huntsman had suffered a MAC at the time they filed the Delaware Litigation, they did not consult with Credit Suisse beforehand or inform Credit Suisse of their intent to do so. Credit Suisse did not learn that Apollo and Hexion intended to assert a MAC until the Delaware Litigation was filed. Credit Suisse did not know Apollo and Hexion were considering litigation until the Delaware Litigation was filed. CS ¶ 99.

The Commitment Letter provides for the Banks to provide financing for Hexion's half of the $100 million break-up fee:

> [O]n or about the date of the signing of the Merger Agreement, in order that Holdings [Hexion LLC] or the Borrower [Hexion] may make, directly or indirectly, the payment in the amount of $100,000,000 that is contemplated by the Merger Agreement (the "Reimbursement Amount") to Wingspan [Huntsman], Holdings will obtain a senior unsecured term loan facility (the "Reimbursement Facility"), on substantially the same terms as the Holdings Facility (with appropriate conforming changes) in the amount (net of all fees, including underwriting fees, and expenses) of the Reimbursement Amount.

CS ¶ 100. Apollo and Hexion witnesses, including Hexion's CEO and Chairman of the Board and Hexion's Treasurer, testified that they did not agree to reduce the amount of committed funding available to be drawn at the merger closing by Hexion's $100 million contribution to the Basell break-up fee. CS ¶ 101.

Mr. Purcell testified, in response to a limited hypothetical, that even if an agreement existed to fund Hexion's $100 million payment toward the Basell break-up fee out of the funding available to close the merger, that agreement, standing

alone, would be immaterial to Huntsman stockholders. CS ¶ 102; PRCS ¶ 102. Apollo witnesses testified that they rejected proposals by the Banks that would have required Apollo to contribute equity to the combined Huntsman-Hexion entity. CS ¶ 104.

Apollo was a profitable client of Credit Suisse, and Credit Suisse considered Apollo to be a partner it could rely on and who would take care of it. Stark ¶ 19. Credit Suisse does not dispute that it considered Apollo a Tier 1 financial sponsor client, that Credit Suisse earned fees by providing services to Apollo, or that it considered Apollo a partner on the financing for the Hexion Merger and many other deals. CSR ¶ 19. Credit Suisse disputes the existence of any side deals, handshake agreements, or private agreements between the Banks and Apollo and further avers that the use of the term "partner" was to acknowledge the shared common goal of successfully completing a transaction, and not to create or connote any binding legal obligation. *Id.*

Through their expert, Dr. Jonathan Arnold, Stark advances three alternative theories of damages, each of which reflects a measurement of "benefit of the bargain" damages. CS ¶ 128. Dr. Arnold's first theory calculates damages based on the hypothetical of the Hexion Merger closing on October 28, 2008, and Stark receiving $29.06 per share for each of the 20.3 million Huntsman shares that Stark held at the peak of their investments in Stark in 2007. Dr. Arnold computes Stark's damages under this first scenario as $105.8 million, after accounting for proceeds from Stark's sales of Huntsman shares. It is undisputed that Stark owned zero

Huntsman shares on October 28, 2008. CS ¶ 129.

Dr. Arnold's second theory calculates damages based on the hypothetical of the Hexion Merger closing on April 5, 2008, and Stark receiving $28.00 per share for each of the 20.3 million shares that Stark held at the peak of their investment in Huntsman in September 2007. Dr. Arnold computes Stark's damages under this second scenario as $84.2 million, after accounting for proceeds from Stark's sales of Huntsman shares. CS ¶ 130. Dr. Arnold's report acknowledges that the Federal Trade Commission did not provide regulatory approval for the Hexion Merger until October 2, 2008. CS ¶ 131. On April 5, 2008, Stark owned approximately 2.59 million Huntsman shares. CS ¶ 132.

Dr. Arnold's third theory assumes the hypothetical that if the alleged misrepresentations were known at the time of Hexion's bid for Huntsman on July 3, 2007, (i) Huntsman would not have terminated the Basell Merger Agreement; (ii) the Basell Merger subsequently would have closed, and (iii) Stark would have received, at the closing of that merger, $25.25 for each of the approximately 5.79 million Huntsman shares that Stark held immediately before Huntsman terminated the Basell Merger Agreement. Dr. Arnold computes Stark's damages under this third scenario as $24.3 million, which includes the $25.25 Basell Merger consideration for Stark's Huntsman holdings as of July 3, 2007, and Dr. Arnold's computation of Stark's out-of-pocket losses. CS ¶ 133.

Credit Suisse's damages expert, Professor David C. Smith, reviewed "all analyst reports and articles in major business publications between July 1, 2007,

and May 13, 2008, (the last day that Stark held Huntsman stock) and found no public information disclosing the terms, changes to the terms, or changes to the availability or amount of financing from the Banks beyond that which was mentioned in the press releases accompanying the announcement of the Hexion Merger Agreement on July 12, 2007." Professor Smith concluded that "there is no reliable basis to connect any losses Stark suffered on its investment in Huntsman stock to the alleged misstatements made by the Banks. CS ¶ 134.

Professor Smith performed an event study to analyze movements in the price of Huntsman's common stock in response to information that might have affected the value of Huntsman's securities during the period in which Stark held Huntsman shares. CS ¶ 135. As part of his event study, Professor Smith examined whether there was any statistically significant movement in Huntsman's stock price following the release of two analyst reports, on September 7, 2007, and February 19, 2008, that Stark stated in their supplemental interrogatory responses "may contain" public information regarding the terms of the financing that the Banks intended to provide. Professor Smith found no evidence that the stock price changes on those dates were any different than what would be expected from random fluctuations in stock and accordingly concluded that neither report caused a drop in Huntsman's stock price that harmed Stark. CS ¶ 136.

Professor Smith concluded that substantial regulatory and economic factors during 2007 and 2008, after the Hexion Merger was announced, likely contributed, in whole or in part, to Stark's losses on its Huntsman investments. Those factors

included: uncertainty surrounding the timing and completion of the merger due to regulatory hurdles; stock market declines and deterioration in Huntsman's profitability related to the global financial crisis and onset of the Great Recession; a spike in fuel-related, raw material feedstock prices that further diminished Huntsman's profitability; and a lower probability that the proposed merger would close due to the effect of the declining economy on the leveraged buyout market generally. CS ¶ 137. Professor Smith concluded that Stark's out-of-pocket losses on sales of Huntsman stock made after July 3, 2007, were between $1.5 million and $5.5 million, net of transaction fees and before considering any offsetting recoveries from Stark's "hedging" activities. CS ¶ 138; PRCS ¶ 138.

## II.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is entitled to judgment as a matter of law" when "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [his] favor." *Fitzgerald*, 707 F.3d at 730 (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## III. ANALYSIS

Credit Suisse's motion for summary judgment sets forth several arguments, including: (1) Stark suffered no losses due to the alleged fraud; (2) the alleged false or misleading statements regarding financing for the transaction are not actionable; (3) there is no evidence of a conspiracy between Credit Suisse, Deutsche Bank, Apollo, and/or Hexion; and (4) Stark's aiding and abetting claim is barred by

Wisconsin's three-year statute of limitations.

## A. Whether the alleged false or misleading statements regarding financing for the transaction are actionable

The Court considers this argument first, finding it most important to resolution of the summary judgment motion. To support the argument that the alleged false or misleading statements regarding financing for the transaction are not actionable, Credit Suisse claims: (1) public statements accurately described the transaction as "not subject to a financing condition," "fully financed," and having "fully committed" financing; (2) there is no evidence that statements made by Huntsman, Hexion, or Apollo regarding financing for the merger are attributable to Credit Suisse; (3) Credit Suisse did not make any false or misleading statements to Stark in connection with the sale of shares from the MatlinPatterson block; and (4) the undisputed evidence shows that the alleged secret agreements were never reached and are not binding.

### 1. Whether public statements accurately described the merger

Credit Suisse argues that the public statements describing the merger as "not subject to a financing condition" and "fully financed" were not false or misleading. Stark counters that Credit Suisse's expert has a different opinion on what fully financed means than does Stark's expert, Mr. Purcell. Stark argues that Mr. Purcell's opinion is that "fully financed" means that there are no non-standard conditions to the money being available, which in turn means that the commitment letter must make full disclosure regarding all material facts, including any

contingencies, which would include the existence of side-agreements modifying the terms and conditions of financing. *See* ECF No. 167, at 30 (referencing Purcell Decl., ¶ 4). Stark alleges that Mr. Purcell's definition, when combined with the alleged side agreements means that the merger was not truly fully financed. Credit Suisse responds that using either definition of fully financed, the statements accurately described the merger financing because there were no side deals. ECF No. 175, at 16.

The Court concludes that there was nothing misleading in public statements pertaining to the merger. As discussed above, those statements disclosed the existence of conditions to financing and risks that financing might not be available. To be sure, Stark did not have access to the confidential Commitment Letter that specified the conditions, but it accepted that lack of knowledge as a bearable risk in proceeding. Nor has Stark established that it had any right to know the content of the Commitment Letter.

In reaching this conclusion, the Court is not improperly deciding a battle of the experts that should be left to the jury. Instead, the Court finds that under either definition of "fully financed" advanced by Stark's expert, the public statements pertaining to the merger were accurate and properly disclosed the risk that financing might fall through. *See* CS ¶ 35, 37-39, 40, 42, 44. Stark executives acknowledged their awareness of the financing risk (CS ¶ 30, 40), and they also acknowledged that a solvency requirement would be a standard financing condition (CS ¶ 29). From this, it becomes clear that everyone understood that terms used in

the public statements, such as "fully financed" or "not subject to a financial condition," simply meant that Hexion had committed to proceed "'even if it could not get financing to complete the acquisition.'" CS ¶ 33 (quoting Stark expert Arnold's report).

2. *Whether statements made by Huntsman, Hexion, and Apollo are attributable to Credit Suisse or actionable*

Credit Suisse argues that Stark cannot succeed on its claims because Stark asserts that the misrepresentations, if any, were made by Huntsman, Hexion, and Apollo, and not Credit Suisse as is required under Wisconsin law. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 211-12 (Wis. 2005). Credit Suisse argues that while Stark makes various allegations that numerous statements were false or misleading, *see* CS ¶ 66, none of those statements were made by Credit Suisse. Because these were third party statements, Credit Suisse argues that it cannot be held responsible even if the statements were false.

Stark argues that the statements are attributable to Credit Suisse because Credit Suisse was aware of the representations made in the Commitment Letter and announcements about the merger. Stark argues that Apollo's and Hexion's actions in extending the fraud, by sharing the fully financed language from the Commitment Letter in public announcements, are attributable to Credit Suisse. *See* ECF No. 167, at 32, referencing *Richards v. Badger Mut. Ins. Co.*, 749 N.W.2d 541 (Wis. 2008) (citing approvingly § 876 of the Restat. (2d) of Torts: a defendant is liable for harm resulting to a third person from the tortious conduct of another if the

defendant (a) "does a tortious act in concert with the other or pursuant to a common design with him," (b) "knows that the other's conduct constitutes a breach of duty and gives a substantial assistance or encouragement to the other so to conduct himself," or (c) "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.") Further, Stark argues that regardless of whether Credit Suisse actually published the allegedly false materials, it still had a duty to speak up regarding the "handshake agreements" in existence.

Credit Suisse's arguments are more persuasive for the simple reason that the statements about which Stark complains were accurate and not misleading, and there were no secret side deals, as discussed above. Nothing in the Prospectus or in the Prospectus Supplement contradicted or mischaracterized the obligations contained in the Commitment Letter. Further, the circumstances here bear no resemblance to those addressed in *Richards*, making that case inapposite. Finally, there is no general duty to speak (even if there was something to say), because the duty to speak only exists in some circumstances between parties to a transaction. *See Studio & Partners, s.r.l. v. KI*, No. 06-C-628, 2007 WL 3342597, at *7 (E.D. Wis. Nov. 7, 2007).

### 3. *Whether Credit Suisse made false statements in connection with the sale of shares from the MatlinPatterson block*

Credit Suisse argues that communications with Stark related to the sale of shares from the MatlinPatterson block did not create a duty for Credit Suisse to

speak up because the communications were about the sale of shares, and not about the financing for the Hexion merger. Credit Suisse argues that it did not have any duty to speak up because (1) Ms. Clark did not want non-public information about the transaction, and (2) Stark was aware that publicly available information disclosed that there were terms and conditions to the financing commitment.

Credit Suisse is correct. There is no evidence that Credit Suisse knew Stark was operating under a mistake to fact about financing or that Stark would reasonably expect disclosure. And again, the record does not indicate that Credit Suisse made any false representations regarding the proposed merger or about the financing for that merger, as discussed above.

### 4. *Whether alleged "secret side agreements" existed*

Credit Suisse asserts that no secret side deals existed between it and Apollo. ECF No. 160, at 35. Credit Suisse acknowledges that two of the alleged "secret" agreements were ratified in a separate letter and disclosed to Huntsman. *See* CS ¶¶ 83-85. Further, Credit Suisse advances evidence to support its assertion that the side agreements did not exist: Apollo witnesses testified unequivocally that they never agreed to any side agreements. CS ¶¶ 90, 93, 96, 97, 101, 104.

Further, Credit Suisse argues that even if there were some secret side agreements, they could not be legally binding because the Commitment Letter had a no oral modifications provision. Essentially, Credit Suisse argues that even if there was some oral side agreement between the parties, such an agreement would not alter its legal responsibility under the Commitment Letter. In response to

Credit Suisse's argument that the side agreements do not exist, Stark offers: "what is made known does not make up for what is not." ECF No. 167, at 34. Further, Stark argues that the appropriate issue is not whether the side agreements were legally enforceable, but whether they existed and were being relied upon by Credit Suisse, as Huntsman would not have accepted the Apollo/Hexion bid had it known that alternate agreements existed.

Stark has not developed a record sufficient to defeat summary judgment. At oral argument, the Court asked numerous times for specifics of a side agreement. *See* Transcript at 12-13; 30-31; 40. Stark was unable to point to a specific agreement. Indeed, after oral argument, Stark submitted a letter to the Court delineating alleged side agreements (*see* ECF No. 197); however, what Stark points to are at most assurances to work together. Nothing that Stark cites indicates an agreement to contravene the financing commitment.

Despite repeated references to alleged secret side deals, no evidence has been developed demonstrating their existence. The parties have engaged in thorough and vigorous discovery, yet the record at this point is no different than at the start of this case: devoid of any proof that anyone engaged in secret side deals having to do with the merger or its financing.

Two of the alleged "secret" agreements were ratified in a separate letter and disclosed to Huntsman. *See* CS ¶¶ 83-85. Executives from Hexion and Apollo, with no financial incentive to protect Credit Suisse, testified that they never agreed to any side deals of the type alleged by Stark. *See* CS ¶¶ 90, 93, 96-97, 101, 104. So

Stark is left with little more than speculation; however, "mere speculation or conjecture will not defeat a motion for summary judgment. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (internal citations and quotations omitted).[6]

## B. Whether there is evidence of a conspiracy

Stark's conspiracy claims must fail because Stark has offered no evidence of an agreement among any of Credit Suisse, Deutsche Bank, Apollo, and Hexion to act in concert to disregard the law. *See Augustine v. Anti-Defamation League of B'Nai B'Rith*, 249 N.W.2d 547, 552 (Wis. 1977).

## C. Motion for Reconsideration

Finally, Credit Suisse has moved for reconsideration, arguing that a recent Delaware Chancery Court decision demonstrated that this Court mistakenly believed that certain language from *Feldman v. Cutaia*, 951 A.2d 727 (Del. 2008), had been abandoned. Even though Credit Suisse is correct about this Court's premature declaration of *Feldman*'s demise, the Court is satisfied that the focus of its analysis, that Stark was seeking to recover for duties owed to it, is still sound, and nothing in *Feldman* disturbs that conclusion. Stark brought a direct action. For reasons discussed above, it could not develop a record to support that action.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the motion for summary judgment filed by Credit Suisse, ECF No. 159, is **GRANTED**.

---

[6] Because the Court finds that summary judgment should be granted on the basis that there was no underlying fraud, it has no need to address the parties' arguments regarding loss.

**IT IS ALSO ORDERED** that Credit Suisse's motion for reconsideration, ECF No. 133, is denied.

**IT IS ALSO ORDERED** that Clerk of Court is directed to enter judgment in accordance with this Order.

Dated at Milwaukee, Wisconsin, this 23<u>rd</u> day of September, 2019.

**BY THE COURT:**

<u>*s/ David E. Jones*</u>
DAVID E. JONES
United States Magistrate Judge
